# Common Pleas.

## NEW-YORK, NOVEMBER TERM, 1824.

*The Mayor, Aldermen and Commonalty*
*of the City of New-York.*
         v.
*Richard W. Slack.*

This was an action to recover the penalty of $250 for the alleged breach of an ordinance made by the plaintiffs, prohibiting the interment of the dead within certain limits of the city.

The plaintiffs allege in their declaration, that they were incorporated by a charter granted to them on the 15th of January, 1730, by letters patent under the seal of the then province of New-York ; and which charter declared that a Board of Common Council should be formed for the local government of the city, and provides, among other things, that said Common Council, or a major part of them, " shall have full power and authority, and license to frame, constitute, ordain, make and establish, from time to time, all such laws, statutes, rights, ordinances and constitutions, which to them, or the greater part of them, shall seem to be good, useful or necessary for the good rule and government of the body corporate aforesaid ; and of all officers, ministers, artificers, citizens, inhabitants and residents of the said city, within the limits thereof ; and for declaring how, and after what manner and order the Mayor, Recorder, Aldermen and Assistants of the said city, for the time being, and all and every of their officers and ministers, and all artificers, inhabitants and residents of the same

NEW- YORK,
1824.

Mayor, &c. of
New-York
v.
Slack.

city, and their factors, servants and apprentices, in their offices, functions, and business within the said city and the liberties thereof, for the time being, and from time to time, shall use, carry and behave themselves; and for the farther public good, common profit, trade and better government and rule of the said city; and for the better preserving, governing, disposing, letting and setting of the lands, tenements, possessions and hereditaments, goods and chattels, to the aforesaid Mayor, Aldermen and Commonalty of the said city of New-York belonging, or to them and their successors hereafter to belong; and all other things and causes whatsoever touching or concerning the said city, or the state, right and interest of the same," with a proviso that such laws should not be contradictory or repugnant to the laws or statutes of England, or of the province of New-York. With power also to enforce obedience to such laws by inflicting certain pains and penalties for their disobedience.

The plaintiffs in their declaration farther allege, that in and by an act of the legislature of this state, passed April 9th, 1813, it is among other things enacted, " that the Mayor, Aldermen and Commonalty of the said city, in common council convened, should have full power and authority to make and pass such by-laws and ordinances as they should *from time to time* deem necessary and proper for regulating, or if they find it necessary, preventing the interment of the dead within the said city; and to impose penalties for the non-observance of the same not exceeding $250.

That on the 31st of March, 1823, the Common Council passed a certain by-law or ordinance prohibiting, after the first day of June, 1823, the digging or opening of any grave in any burial ground of the city, or in any

other part or place of the city which lay to the south-ward of a line commencing at the centre of Canal-street, on the North River, and running through the centre of that street to Sullivan-street; thence through Sullivan to Grand-street; thence through Grand-street to the East River; or the depositing any dead body in such grave, or in any vault or tomb within these limits.

The plaintiffs farther allege, that the defendant, on the 12th of July, 1823, caused an interment to be made in a vault in St. Paul's church yard, and thereby incurred the penalty exacted by this ordinance.

The defendant pleads that the action ought not to be maintained against him, because the rector, church-wardens, and vestry-men of Trinity church, in the city of New-York, are and have been, for one hundred years past, and were at the time that the city charter was granted, seized in fee of the burial ground attached to St. Paul's church, and had appropriated the same for a burial ground, for the members of the congregations belonging to their church; that the defendant was a sexton in their service, and had the charge of this cemetery, and that the interment complained of was of the body of one who had been a member of this church.

And the defendant, for a second plea, alleges, that on the 22d day of Oct. 1817, the said rector, church-wardens and vestry-men, by their deed did, for a good consideration, grant and assign to Mr. Schrady and to his heirs, the use and occupation of a piece of land in this burial ground, for the purpose of his erecting thereon a vault for the use of his family: that such vault was erected by him, and the body of Mr. Schrady was interred therein by the defendant, with the license of the rector, church-wardens and vestry-men, and also with the license of the heirs of Mr. Schrady.

To these pleas the plaintiffs have interposed a general demurrer, and the defendant has joined issue upon it.

*The same Plaintiffs* v. *Peter Stuyversant.*

This action was brought for the like penalty against the defendant, who is a sexton in the employ of the ministers, elders and deacons of the Reformed Protestant Dutch Church of the city of New-York, and is for an interment by him in the Middle Dutch churchyard.

The pleadings are the same as in the preceding case. The interment was made on the 14th day of December, 1823.

*The same Plaintiffs* v. *Edward Coates.*

This action is for the like penalty against the defendant, as sexton of Trinity Church.

The declaration contains the same allegations on the part of the plaintiffs as in the preceding suits.

The interment was made on the 10th of April, 1824.

The defendant pleads that the place in which such interment was made is a part of Trinity church-yard, granted by letters patent, dated 6th May, 1691, under the authority of William the Third, King of Great Britain, &c. constituting certain persons a body corporate and politic, by the name of the Rector and Inhabitants of the City of New-York, in communion of the Protestant Episcopal Church of England, and which letters patent confirmed to them and to their successors this piece of land for a cemetery and burying ground, with all the rights, customs, fees, perquisites, profits, hereditaments and appurtenances thereunto belonging or appertaining, and as the same was then in their possession : that this piece of land had been appropriated before that time and since to the interment of the dead for certain fees and profits, to the use and benefit of the said Rec-

tor and Inhabitants, and who had authorized the defendant to make the interment complained of.

The same issue in law has been joined in this cause.

*The same Plaintiffs* v. *Edward Coates.*

This is a like action against the defendant as Sexton of Trinity Church.

The declaration contains the same allegations on the part of the plaintiffs as in the preceding suits.

The interment was made on the 30th of April, 1824. The defendant pleads that the part of Trinity churchyard in which such interment was made was granted by a deed from the plaintiffs, on the 22d of April, 1703, to the Rector and Inhabitants of the city of New-York in communion of the Protestant Episcopal Church of England, on condition that they should keep the same enclosed, and should appropriate it for part of the public church-yard of Trinity Church, and as a burying place for any of the inhabitants of this city ; and that they might have and demand to their own use for the preparation of graves certain fees therein specified.

That these conditions had been observed, and that the defendant was duly licensed to make the interment complained of.

There is also a second and a third plea substantially agreeing with those interposed in the above mentioned case against Richard W. Slack.

The same issue in law is joined in this case.

*The same* v. *Henry Spies.*

This is a like action against the defendant as sexton of the Brick Presbyterian Church, for an interment on the 21st of December, 1823.

NEW-YORK,
1824.

Mayor, &c. of
New-York
v.
Slack.

The declaration contains the same allegations on the. part of the plaintiffs as in the last suit.

The defendant pleads—first, that the interment was made with the license of the plaintiff; second, that the vault in which the interment was made is part of certain premises described in indentures of lease and release made respectively on the 24th and 25th of February, 1766, between the plaintiffs and John Rodgers and others, the minister, deacons and trustees of the English Presbyterian Church in the city of New-York, under the conditions mentioned in the release, authorizing them to use the same for a burial ground; that the present corporation of the Brick Presbyterian Church hold this property by a conveyance to them, subject to the same terms and conditions.

That the by-law relating to the interment of the dead, was passed without giving to the corporation of the Brick Church any compensation for its rights, in relation to burials, and which were affected by that ordinance.

That the defendant made the interments in question with the license of the corporation of the Brick Church.

The defendant, for a third plea, alleges that the action could not be maintained, because the premises in which said vault was built had been conveyed to the original grantees by the plaintiffs in fee, on condition that they should pay a certain rent, and that upon payment of the same, and performing the other conditions mentioned in this release, they were to hold and possess the premises as, and for a burial ground, without any interruption of the plaintiffs or their successors, or of any persons claiming under them, or by or through their acts, means or procurement, with a covenant on the part of the plaintiffs, that while these conditions were observed,

the plaintiffs would not molest or interrupt them in the use of these premises for a burial ground.

The defendant, also, for a fourth plea, alleges, that the premises were conveyed for a burial ground in fee ; and were thus used and appropriated with the permission of the plaintiffs, and had been so used for 70 years past.

The express license of the plaintiff contained in the first plea is denied by them, and they have demurred to the three last pleas, and issue has been joined on this demurrer.

The discussion of the sufficiency of the pleadings in those several cases has given rise to much critical examination of certain principles in the constitution of the United States, and of their bearing upon the questions presented to me.

With respect to the first case, which relates to a burial in St. Paul's church-yard, it has been urged, on the part of the defendant, that the ordinance under which this penalty is exacted is void, as it relates to this interment, because it is contrary to the 10th section of the 1st article of the constitution of the United States, which provides that "no state shall pass any law impairing the obligation of contracts ;" and to the fifth article of the amendments to the same constitution, which declares "that private property shall not be taken for public use without just compensation," (also incorporated into the 7th section of the 7th article of the constitution of this state.)

If this by-law does interfere with both or either of these great principles, there can be no doubt of its being void, and that it is the duty of this court to pronounce it so.—(2 Dal. 309. 3 Dal. 386. 1 Cranch, 178.) But

NEW-YORK,
1824.

Mayor, &c. of
New-York
v.
Slack.

the serious question is, whether it does conflict with these cardinal principles of the constitution?

Every man who enters into civil society, surrenders to the sovereign power a right in some degree to control his personal acts, and if necessary for the general good, to regulate him in the use and enjoyment of his property. The freedom which he possessed in a state of nature is considerably abridged, and the property he acquires becomes subject to such laws as shall be made for the welfare and prosperity of the whole commmunity of which he is a member.

Puffendorf reduces the supreme power of a commonwealth into three heads, (book 8, chap. 5.) the right of regulating the use of property, the right of taxing it, and the right of taking it for public porposes.

Under the first head he places the sumptuary laws which prevailed in the Roman commonwealth ; the laws against gaming ; the laws that forbade the digging of ore to the waste and impoverishment of the soil, and a variety of others which regulated and controlled men in the use and enjoyment of property.

The rights of regulating the use of property and of taxing it, he defines as belonging to the sovereign power, without accountability to the subject ; but that the right of taking it for public purposes could never be assumed without a just compensation.

Vattel preserves the same distinctions, (book 1. chap. 20. sec. 246.) and while he maintains that a compensation must be rendered for property taken for the use of the people, yet he observes that laws may be made " regulating the manner in which common goods are to be used, as well those of the entire nation as those of distinct bodies or communities ;" and he remarks " that

the care which ought to be taken of the public repose and of the common advantages of the citizens, gives to the sovereign authority doubtless a right to establish laws tending to this end."

He presents, by way of illustration, (sec. 255.) the power the government has in a country whic his in want of corn, and in which vines are greatly multiplied, to forbid the culture of the vine in fields proper for tillage, because the welfare and safety of the public were concerned in such regulation.

Of the necessity which requires this interference the governing power must be the judge. Such interference, however, should not be capriciously indulged in : it is to be justified only by the urgency of the occasion, and the paramount claims of the public welfare.

The proper inquiry, then, in the present case, will be, whether this ordinance, prohibiting the interment of the dead in the lower wards of this city, is in itself a legal regulation, and not affected by those provisions in the constitution ; and whether there is any right peculiar to the fee by which the burial ground of St. Paul's Church is held which takes that ground out of the scope of this prohibition.

It is urged that this fee has been held by its present proprietors, the corporation of this church, for upwards of a century ; that it has been appropriated exclusively as a cemetery during the whole of that period ; that a part of it has been granted to a Mr. John Schrady, for the purpose of erecting therein a vault ; that such vault has been built by him, and in the same the very interment has been made for which the penalty is exacted by this suit.

There is something sacred in those peaceful sepul-

chres in which the remains of our fathers and kindred repose, and where we have cherished the hope of one day being gathered with them ; and I am aware that it is an ungracious task to mar those feelings which cling to the remembrance of those who were dear to us in life, and to supply the strict rules and principles of law to this hallowed species of property ; yet, according to these rules and principles, I can perceive no difference between a fee which is held by an individual and that which is held by a religious corporation; nor whether it has only been created yesterday, or has become venerable by its antiquity. The same restrictions may be applied to both. Could then an inhabitant of this city be prevented by a public law from interring any deceased member of his family in a grave prepared in his own private property ?—Have the corporation of this city the power to prohibit such interment ? I speak now in reference to a right of interment claimed on the ground of being possessed of the fee of the soil. It can hardly be questioned but that both propriety and a regard to the public health would require and justify the public interference with interments on private lots, in the lower wards of this city ; and yet, if this is conceded, the principle contended for, as it respects the mere right of regulation, is conceded with it. In this point of view, there can be no distinction in principle between an interment on the lot of an individual or in an open burial ground. The only distinction which exists arises from those feelings of repugnance at such private interments, which, though honourable to our nature, are but matter of feeling only : the mere right in both is the same ; and if it can be legally controlled in the one, it can be legally controlled in the other.

The individual who is prevented from using his pro-
perty in this way, is not restrained from using it in any
other way compatible with the public good, and not pro-
hibited by existing laws. So, no other restraint is placed
in the use of any land which has been hitherto appro-
priated as a cemetery, though I agree that it would be
deeply to be regretted that any secular use should be
made of those hallowed depositories.

Does the right to continue those cemeteries as places
of interment consist in the long use which has been
made of them for that purpose? If such were the case,
then, however urgent might be the public necessity of
any alteration, and which necessity might, in fact, have
grown out of this very use, yet the antiquity of the use
would prevent such interference, however salutary it
might be, and however imperiously required by circum-
stances. This never can be consistent either with the
rights or the duties of those into whose hands is placed
the power of so regulating the use of property that the
public may receive no detriment from it. Such princi-
ples are at war with those wholesome regulations, which
have from time to time been made in all civil communi-
ties, and which often seriously affect private interest and
private convenience, but still are upheld as promotive of
the public welfare.

But the right of interment in the burial ground of St.
Paul's Church is called a vested right, protected by the
constitution, and which cannot be taken away. With
all the respect which I feel for the learned counsel who
so eloquently pressed this position, I am constrained to
object to it. I know of no right that will permit either an
individual or a corporation to use its property free from
those restraints which the legislature may from time to

NEW-YORK,
1824.

Mayor, &c. of
New York
v.
Slack.

time impose for the public welfare. No such right is vested, nor will the use of it in any particular way for a long time unrestrained make it a vested right.

I would not wish to be understood as expressing any opinion of the utility or the inutility of the present ordinance. With the expediency of passing it, I have nothing to do : the propriety or necessity of its adoption is determined by others ; my province is only to decide whether its enactment is legal, and whether its observance can be enforced in a court of law.

Is it more than a regulation which may be legally made ? A regulation of this nature consists in judiciously determining what restraints are necessary to be imposed upon the use of property to prevent its doing a public injury.

To be just, it ought to have in view the good of the whole community, embracing equally the good of the very individual whose pecuniary advantage may be immediately affected by it. Such was the case of a by-law made by the Corporation of Exeter, under a general power given them by charter to make by-laws, and which prohibited butchers and others from slaughtering animals within that city, under certain penalties. Lord Mansfield held such by-law, (1 Cowper, 269.) to be a proper regulation of trade. So it is held, (Comyn's Dig. 3. tit. By-Law, c.) " that a by-law to restrain butchers, chandlers, and others, from setting up in Cheapside, or such other eminent parts of the city of London, was good, because such trades were offensive, and apt to create diseases, and that therefore for fear of infection, and for the sake of public decorum and conveniency, such kind of offensive trades might be removed to places of more retirement."

And it is held that " where a restraint appears to be of manifest benefit to the public, such is to be considered rather as a regulation than a restraint." (Willes. 388. 1 Stra. 675. 2 Str. 1085. 3 Burr. 1328. 1 H. Bla. 370. 1 Roll. Abr. 365. 3 Salk. 76. Sid. 284. Carth. 482. Cowp. 270. 2 Kyd on Corpor. 149.)

In this hall many and important regulations have been made, some of them bearing hard upon the interests of individuals, but yet they have received the sanction of repeated legislatures and of councils of revision distinguished for their legal discernment and ability. To enumerate but a few :—In the act to reduce several laws relating particularly to the city of New-York into one act, (2 Stat. Laws, 342.) and which embraces the various provisions which had been made by preceding legislatures, the 59th section directs with what materials buildings are to be erected within certain limits of this city. The 66th section prohibits the keeping of gunpowder over a certain weight in any one place. (The like also by special act for Brooklyn in Kings county— laws of 43d sess. 180.) The 71st section, the keeping of sulphur, or of hemp or flax, over a specified weight ; or (72d section) pitch, turpentine, and other combustible articles.

The 272d section authorizes the common council to regulate the butchers, and to prohibit and restrain them from carrying on their business at any other place than what may be designated. Similar regulations are authorized to be made in the acts relating to the city of Albany. (2 Rev. Laws, 467. ;) the city of Schenectady (ibid. 482, 483. ;) city of Hudson (ibid. 495. ;) city of Troy, (4 vol. of the Laws, 137.) The legislature have likewise interfered with the particular use of some of our rivers

NEW-YORK, and private streams. They have restrained the set-
1824.        ting of nets or the drawing of seines in certain waters,
Mayor, &c. of   and the fishing in some private streams during particular
New-York
v.          seasons of the year, or for a particular period. (2 Rev.
Slack.      Laws, 238.)  By the act to provide against infectious
and pestilential diseases, power is given to the health
officers, in certain cases, in order to prevent infection
or contagion, to destroy certain property, particularly
circumstanced. (Laws of N. Y. sess. 46. chap. 71. sec.
9.) The introduction of some kinds of merchandize
into the lower part of the city, during particular months
of the year, is prohibited (21st section,) and the removal
of other goods of the same kind from thence compelled,
(33d section.)

To farther the object of the law, the board of health
of this city is empowered to fence up streets and lanes,
and to prevent any passage through them.

If the legislature have authority thus to control the
use of property, they have a right to invest the inhabi-
tants of any place with the same privileges for its local
government. (Salk. 193. Kyd on Corporations, vol.
I. p. 47.)

The Common Council of this city, in pursuance of the
authority given them by their charter, and also by a
special act of the legislature, have from time to time re-
gulated the interment of the dead. (Corporation Ordi-
nances of 1801, page 30.; of 1808, page 48.; of 1817,
page 19.; and the present ordinance of 1823.)  Nor is
this authority to control such interments confined to the
city of New-York; the same is expressly given to the
Common Councils of the cities of Albany, Hudson, Sche-
nectady, and Troy.

It has, however, been contended that the present ordi-

nance cannot be considered, in regard to St. Paul's Church burial ground, as a mere control of the use of property in one particular way : but that in fact it is a prohibition of the only use to which, with a due respect to the public feeling, it can be appropriated, and .that therefore its value is almost annihilated.    The laws I have enumerated, and the constitutionality of which has never been questioned, materially affect the value of the property on which they operate.    The health and quarantine laws greatly impair the value of various kinds of property ; yet these laws have been declared constitutional by the highest tribunal in the land.    (9 Wheaton, 205.)

The late acts of the United States (Dec. 22, 1807, and March 12, 1808.) " which laid and enforced an embargo on all vessels within the limits of the United States, cleared or not cleared, bound to any foreign port, and which prohibited the exportation from the United States in any manner whatever, either by land or water, of any merchandize, of foreign or domestic growth and manufacture," were, undoubtedly, among the strongest and boldest acts of legislative power.    By their operation, our vessels were confined to our harbours, and our merchants were restrained in the most profitable employment and almost sole use of this species of property, yet the constitutionality of these laws, in all the litigation which has arisen out of them, has never been impeached.    It was indeed made a question in the district court of Massachusetts, (United States v. Brigantine William, 2 Hall's Amer. Law Journal, 255. ;) but after an elaborate argument these laws were held constitutional by Judge Davis, who learnedly examined all the arguments which had been advanced against their constitutionality,

nor did he consider the ground that no period was fixed in the laws for their termination as a valid objection.

The cases cited by the counsel for the defendant, as establishing a doctrine different from what I have endeavoured to present, or as embracing in their respective decisions the opinion of the Supreme Court of the United States, that laws similar in their nature to this ordinance are unconstitutional, will, I think, upon an examination of the points decided in these cases, not warrant the conclusion which has been drawn from them.

The case of Fatcher v. Peck, (6 Cranch, 87.) related to an act of the legislature of the state of Georgia, by which one legislature revoked the contract of a preceding legislature, and *devested* an estate which it had granted.

The case of the State of New-Jersey v. Wilson, (7 Cranch, 164.) related to a compromise entered into between that State and the Delaware Indians, by which the Indians gave up their claims on a considerable portion of lands in New-Jersey, on condition that the government should convey to them a tract of land on which they might reside, exempt from taxation. The legislature afterwards passed an act to *take away* this exemption.

The case of Jewitt v. Taylor, (9 Cranch, 43.) was an act of the legislature of Virginia *devesting* the Episcopal Church of Alexandria of their title to certain lands.

The case of Dartmouth College in Woodward, (4 Wheat. 518.) was a direct interference on the part of the legislature of New-Hampshire with that institution, radically and essentially altering its whole organization. In all these cases the respective legislatures *devested* those affected by their acts of some property or interest,

and the acts were declared void as impairing the contracts by which the lands were held.

So in the case of the People v. Platt and others, (17 Johns. 194.) a mill dam, lawfully erected, was sought to be prostrated by means of an act of the legislature of this state.

But the present ordinance does not take away the land belonging to this church, or impair the title by which it is held. The ordinance is general in its nature, embracing alike all property, and prohibiting to all the use of their property as places of interment within certain limits of the city. It has been remarked that this ordinance does not set forth, by way of preamble or recital, the alleged necessity which called for its enactment.

It is usual for laws of this kind to state such necessity; but I do not consider the omission as affecting its validity, (8 Mod. 144.; 4 Bac. Abr. stat. 1.; 2 Com. Dig. by-law, b. 1.; 19 Vin. Abr. Stat. E. C. plac. 101.)

It has been farther urged that this ordinance cannot be enforced against the rector, church-wardens and vestry-men of Trinity Church, the owners of this burial ground, without first giving them a just compensation for the injury they may sustain.

Whether such compensation ought to be given or not, must depend upon the previous question, whether this ordinance is not in itself a legal regulation? If so, as I think it is, the city corporation cannot be compelled to make such compensation. In none of the various cases where legislatures, or those having legislative power, have interfered with the concerns and property of individuals, has any provision been made for compensating those whose pecuniary interests might be injured by

NEW-YORK,
1824.

Mayor, &c. of
New-York
v.
Slack.

such interference.   No laws, surely, have operated more rigorously on the fortunes of many than the acts laying and continuing the embargo before referred to, yet no compensation was provided.

These laws were considered as justified by the public exigency, and as having in view the general good.  Such necessity and object are the essentials of every just regulation, and when it combines these essentials, however partially it may affect the pecuniary interests of some, it is nevertheless to be obeyed and enforced.—" *Salus populi est suprema lex.*"

This ordinance was, no doubt, deemed a measure beneficial to the whole population of our city, and required as a preservative of the health of its inhabitants. If those who framed it had a right to judge both of its necessity and expediency, it appears to me to be like those general laws which. I have mentioned, and in which no provision is made for compensating those who may sustain any loss by their operation.   Indeed, if the principle is once admitted, that compensation in such cases must be given, to what length shall it extend, and where shall it be stopped ?  The manufactory of various articles in a city prejudicial to the public health could not be prohibited without first paying for the manufactory and the machinery which had been employed in their preparation ; and, as was remarked by one of the plaintiffs' counsel, the turning of grain into malt could not be prohibited, however great the prevailing want, without first paying for all the distilleries which would in consequence be thrown out of employ.

But even could precuniary compensation be required for the loss that might arise from the operation of this by-law, it seems to be a question whether such compen-

sation should precede the obedience to the law. (20 Johns. 743. Jerome and others v. Roosa, late chancellor's opinion, July 29th, 1823.)

As to the defendant's second plea, that this interment could not be prohibited, because it was made in a vault belonging to the late John Schrady, and which had been conveyed to him for that express use by the rector, church-wardens and vestry-men of the Trinity Church. I do not consider these facts as presenting the merits of this case in a new point of light, or as offering any substantial reason why this ordinance does not prohibit such interment. If the rector, church-wardens, &c. cannot hold those premises exempt from this regulation, they surely cannot convey greater rights to others than they themselves possess.

If the corporation have a right to control such use as those who held the fee might otherwise make of the land, it would necessarily follow that all who hold or derive title under them must be subject to the same control.

While the right to pronounce a law to be unconstitutional is one of the highest prerogatives of a court of justice, and as such is the safeguard of the person and the property of the citizen, yet it is only where from facts shown to the court the conclusion clearly follows, that the deliberate acts of the representatives of the people are not to be thus impugned. On this highly momentous subject, Chief Justice Marshall (6 Cranch, 128.) remarks, that "the question whether a law be void for its repugnancy to the constitution, is at all times a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case. The court when compelled by duty to render such a

NEW-YORK, 1824.

Mayor, &c. of New-York v. Slack.

judgment, would be unworthy of its station, could it be unmindful of the solemn obligations which that station imposes. But it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers and its acts to be considered as void. The opposition between the constitution and the law must be such that the judge feels a clear and strong conviction of their incompatibility with each other."

The same sentiments have again and again been re-iterated. (2 Yeats, 493.; 1 Cowen, 564.; 7 Cranch, 164.; 9 Cranch, 43.; 4 Wheat. 625.) I have approach-ed this subject with diffidence; but after a careful ex-amination of all the authorities submitted to me, with such others as have been furnished by my own research, I have not been able to bring my mind to the conclu-sion that this ordinance conflicts with any provision in the constitution of the United States or of this state, and I think such must be the conclusion to exempt this burial ground from the general prohibition contained in this ordinance; for in my judgment sufficient has not been shown me to entitle it to a *particular exemption.*

The second case, against Mr. Peter Stuyversant, the sexton of the Middle Dutch Church, presents only the same questions which have been considered in the pre-ceding case.

The third case, against Mr. Edward Coates, the sexton of Trinity Church, relates to an interment in the south part of the burial ground of that church. The right of interment is claimed on the plea, that this ground was granted on the 6th of May, 1697, by letters patent under the authority of William the 3d, then King of Great Britain, &c. as a place for the burial of the dead, and

that it has been altogether used as such since that pe-
riod.

There can be no difference in principle between this
and the preceding cases. The only distinction which
exists between them is in the condition attached to the
grant, that it should be used as a cemetery.

· The grant of the crown, like the grant or convey-
ance of an individual, must be subject to such laws as are
made for the public good. If an individual cannot, by
any condition which he may attach to the conveyance
of land, prevent the legislature from controlling its use,
when such control may become necessary for the pub-
lic benefit, so no greater or more sacred privilege is con-
ferred because the property has been the gift of royal
munificence. It was before the revolution subject, as
all other property, to the colonial laws, and at present
must submit to the restraints of the existing government.
(Hob. 210.)

It is true, it has been granted for a cemetery, and if
appropriated to other purposes, were it not for this ordi-
nance, it would revert to the state as the representative
of the crown, the condition not being performed; but,
as the ordinance prevents the observance of this condi-
tion, the estate is discharged of the condition, and be-
comes absolute in the grantees. (Coke Litt. 206. Bull.
Ni. Pri. 164. 3 Comyn's Dig. Condition D. 1—7.)

If the plaintiffs also have been the cause of this disa-
blement, and have prevented the condition from being
kept, they never can take advantage of the condition.
(5 Vin. 246. tit. Condition, N. C. plac. 25. ; Coke Litt.
206. a.)

The fourth case is also against Mr. Edward Coates,.

NEW- YORK,
1824.

Mayor, &c. of
New-York
v.
Slack.

and relates to an interment in the north part of the burial ground of Trinity Church.

This part was granted to the rector and inhabitants of this city in communion with the Protestant Episcopal Church, by a grant from the corporation of the city of New-York, on the 22d of April, 1703, on condition that the same should be used as a cemetery for the public generally, at certain specified rates, to be allowed for the preparation of graves, and to which use it has been since appropriated at the rates prescribed.

The fifth case is against Henry Spies, the Sexton of the Presbyterian Brick Church, and relates to an interment in one of the vaults of that church. The pleadings allege that the ground in which this vault is built, was also granted to the representatives of that church, by certain conveyances from the corportion of this city, in February, 1766, for a cemetery, at a certain rent, and with an express covenant, on the part of the corporation, that the same should be thus held and used without any interruption from them or their successors, or by any person, with their procurement.

The distinction between the third and the fourth and fifth cases consists in the grant in the two last cases being from the mayor, aldermen and commonalty of the city of New-York, and in respect to the Brick Church, reserving a certain rent, and containing a covenant on the part of the grantors against any molestation from, by or through them ; and the question is, whether a grant thus emanating from the plaintiffs themselves, and containing an express covenant for quiet enjoyment, places the two last mentioned burial grounds beyond the control of this ordinance.

I think, in respect to a corporation invested with

the local government of a place, a distinction is to be made between its capacity for holding and transferring property, and its capacity to legislate for the good of the place with whose government it is invested.    In the latter capacity it stands in the place of the legislature of the state, possessing certain powers delegated to it for the purpose of self-government.

If the corporation did not possess this legislative authority, could not the state interfere in cases where the general good called for such interference ? and if so, does not the same authority devolve upon the corporation in its legislative capacity, distinct from the ordinary rights which it possesses as a mere corporation ? A corporation, like an individual, may transfer property and enter into certain covenants to assure and confirm the same, but it is seriously to be doubted whether a corporation, like the city of New-York, can, by any covenant, trammel its legislative powers, or that such covenant, if entered into, can restrain any future act of legislation that may affect it, if the act of legislation is in itself salutary and expedient for the general good.

If a power of this kind, and to this extent, did exist, it would enable either an unwise or indiscreet board to tie up and restrict some of the most salutary powers of their charter, and to bind their successors by a covenant improvidently made.    A grant of land without the compact part of the city a century since, for the purpose of a special manufactory, or for a depository of gunpowder, with a covenant that the grantee should not be molested in such use of it, would impede the operation of an ordinance interrupting such use, however much the same might afterwards be imperiously required by a regard to the health and safety of a population thickly settled around it.

NEW-YORK,
1824.

Mayor, &c. of
New-York
v.
Slack.

In the case of the Commonwealth v. George Bird, (12 Mass. Rep. 4422.) it appeared that by certain privi-leges granted by a statute of the state of Massachusetts, passed in 1743, Bird had acquired an exemption from militia duty. This exemption was taken away by the operation of a statute of 1810.

It was contended that the legislature could not have contemplated revoking exemptions which had been acquired under preceding laws. " That it was contrary to the ordinary course of legislation, and to the common principles of justice, to destroy a privilege once granted, and especially when the grant was in consideration of public services performed by an individual." " The only question," says Judge Jackson, who delivered the opinion of the court, " is, whether the legislature had power, under these circumstances, to revoke the exemption formerly enjoyed by Bird, and to require him to do duty among the conditional exempts. We are not prepared to say that any one set of legislators can control their successors to this extent in a case of such vital importance to the commonwealth. There may, undoubtedly, be cases in which it might be deemed a breach of the public faith to revoke such exemptions, and it is not to be supposed that the legislature would do it in any case, without very powerful motives. But we are not authorized to weigh these motives, or to suffer them to have any influence in our decision where the law is clearly and unequivocally expressed."

The same course of reasoning is applicable to the acts of corporations invested with certain legislative powers.

In the case of Fairtitle, on the demise of Mytton and others, v. Gilbert and others, (2 Term, 169.) the trustees

of a public turnpike act, which empowered them to erect toll-houses and to mortgage the tolls, but not the toll-houses or gates, and who had in fact mortgaged the latter, were not held as estopped by their deed from insisting that they had no such power; and although their having gone beyond the scope of their authority, was considered as one of the strongest arguments against their being estopped by their deed. Yet it was also held by the court " that although a party granting is estopped by his deed from saying he had no interest, yet that general principle did not apply to those who were acting not for their own benefit, but for the benefit of the public."

So in the case of Gozler v. the Corporation of Georgetown, (6 Wheaton, 593.) the latter were empowered by an act of the legislature of Maryland to make such by-laws for the graduation and levelling of the streets in that town, as they might judge necessary for the benefit thereof, and in pursuance of such authority they had, in 1799, by an ordinance appointed commissioners for that purpose, and had ordained that the decision of such commissioners should be the true graduation, and binding upon them and all others; yet afterwards, in 1816, by an ordinance they altered this graduation. It was urged that the first ordinance, in 1799, was in the nature of a compact, and unalterable; and while Chief Justice Marshall, who delivered the opinion of the Supreme Court, admitted that a promise had been held forth to all who should build on the graduated straits, that such graduation should be unalterable, yet, he observed " that the court found great difficulty in saying that the ordinance in 1799 should operate as a perpetual restraint upon the corporation." " The powers," he adds, " of this cor-

NEW-YORK,
1824.

Mayor, &c. of
New-York
v.
Slack.

NEW-YORK, poration to make a contract, which should so operate as
1824.        to bind its legislative capacities for ever thereafter, and
Mayor, &c. of disable it from enacting a by-law, which the legislature
New-York   enables it to enact, may well be questioned.   We rather
v.         think that the corporation cannot abridge its own legisla-
Slack.     tive power."

Although there is a covenant in the conveyance to the
trustees of the Brick Church, that the trustees, while they
use the premises as a cemetery, shall not be interrupted
by the corporation of this city in such use, yet this cove-
nant is still binding upon the corporation, notwithstand-
ing the trustees are prevented by the ordinance from
longer appropriating these premises to that use.    A thing
lawful to be done when the party entered into a cove-
nant to do it, and which it afterwards prohibited by law,
the covenant is still binding ; (3 Mod. 39. 1 Salk. 198.
Lord Raym. 1459.) and where one covenants not to do
a thing which it was unlawful for him to do at the time,
and afterwards an act makes it lawful, the act does not
repeal the covenant.    (Lord Raym. 321. 1 Salk. 198.)
Even then, could the matters contained in these grants,
and in this covenant, be technically pleaded by way of
estoppel, their merits would not, in my judgement, be suf-
ficient to prevent the operation of this by-law in inter-
ments, in either of those cemeteries.

But the plea is extraordinary in its nature ; it does not
deny either the by-law, or that the interment in question
was made in defiance of it; but it offers to put in issue
the effects of such by-law upon land circumstanced as
those church-yards are, and as it is asserted, so privi-
leged.

Upon this the plaintiffs could not take issue, and leave
it to a jury to determine what would be the effect of

this ordinance upon those respective premises; and whether it ought, therefore, to be obeyed or not ? A party may be estopped by his deed from denying it; but he cannot be estopped by the deed which he has given from alleging the existence of a public law, or asserting the applicability of such law to any case which infringes it. Such law the court itself is bound to notice in the discharge of its official duty. (4 Co. Rep. 76.)

NEW-YORK,<br>1824.<br><br>Mayor, &c. of<br>New-York<br>v.<br>Slack.

If this ordinance becomes oppressive, or operates unjustly, the legislature in the very act by which they have clothed the corporation with power to make it, have provided that any ordinance passed in pursuance of the power thereby granted, they may at any time repeal.

I have given the merits of the pleadings in these several cases, and the facts admitted by them, as careful an examination as the short interval since the argument at the last term, and the other duties of a laborious office would permit. It is highly satisfactory to me that the judgment of this court will be carried to a higher tribunal for revision, and the collected judgment of others be taken upon the decision which is here given. "It is," in the language of the late Judge Paterson, "a consolatory idea in the administration of justice, that no opinion of a single judge can be final and decisive, but that the same may be removed before the highest tribunal for revision, where, if erroneous, it will be rectified."

On the demurrers in these several suits, judgment is given for the plaintiffs.